IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| BORISLAV A. TODOROV | * | |
| Pers. Rep. of the Estate of Cynthia Rubinstein | * | |
| | * | |
| v. | * | Civil No. JFM-14-3548 |
| | * | |
| IAN RUBINSTEIN | * | |
| | * | |

******

**MEMORANDUM**

Plaintiff Borislav Todorov, personal representative of the estate of Cynthia Rubinstein ("Cynthia"), asserts claims against defendant Ian Rubinstein ("Ian") for undue influence and unjust enrichment. The parties have filed motions for summary judgment. (ECF Nos. 14, 23). I have considered the parties' memoranda and no oral argument is necessary. *See* Local Rule 105.6. For the reasons below, both parties' motions are denied.[1]

**BACKGROUND**

Cynthia Rubinstein, whose assets are at issue in this case, was first diagnosed with cancer in 2013. (ECF No. 23, Ex. B, 5:12–15). She underwent treatment from 2013 until April 9, 2014, when, due to her condition, she decided to transfer to from Greater Baltimore Medical Center to Gilchrist Hospice ("Gilchrist") in Towson, Maryland. (ECF No. 14, Ex. 1). Cynthia's condition deteriorated and she died three days later on April 11, 2014.

While at Gilchrist, Cynthia was surrounded by family and friends. (ECF No. 23, Ex. A, 39:5–12; *see also* ECF No. 14, Ex. 5, p. 1). Cynthia chose her brother, Ian, as her primary care giver and health care decision maker. (ECF No. 14, Exs. 1, 2). It is contested how important

---

[1] Ian has also filed a motion to dismiss. (ECF No. 15). That motion is denied.

1

Ian's role actually was. Once Cynthia arrived at Gilchrist, Ian did not make any health care decisions and Todorov himself describes Ian's selection to these roles as "just procedure." *Id.* at 72:9–74:5. However, Gilchrist's records also show that, on two occasions, Ian spoke on behalf of his sister by indicating to nurses that he did not want his sister disturbed. (ECF No. 14, Ex. 5, p. 1). The same records show Gilchrist nurses communicated a plan of care to Cynthia's family, which presumably included Ian, and educated Cynthia's family on her medications. *Id.* at Ex. 4, pp. 1, 8–9.

Ian's involvement with Cynthia's medical treatment constituted a departure from his previous dealings with Cynthia's cancer. Before Cynthia's admission to Gilchrist, Ian had never taken his sister to cancer treatment. (ECF No. 23, Ex. A, 23:18–19). Further, Ian played no role in Cynthia's decision to transfer to Gilchrist–Cynthia made the decision herself. *Id.* at 73:2–8.

At the time of her death, Cynthia was married to Todorov, who represents Cynthia's estate in the present action. (ECF No. 1, Ex. 2, p. 1). Cynthia and Todorov were married for more than ten years prior to her death. When Cynthia died, she died intestate, leaving her entire estate to Todorov. *Id.* at Ex. 1, p. 1. Shortly after Cynthia's death, both Todorov and Ian applied to serve as personal representative of Cynthia's estate. After a contested hearing between Todorov and Ian, the Orphans' Court of Baltimore County appointed Todorov personal representative of Cynthia's estate. (ECF No. 14, p. 5).

The present dispute arises out of an April 11, 2014 asset transfer from Cynthia–while staying at Gilchrist–to Ian. On the second day of her brief three-day stay at Gilchrist, Cynthia signed a notarized document authorizing the transfer of $420,518 in cash and securities to Ian.[2] (*See* ECF No. 1, Ex. 4, p. 5). The next day, Ian allegedly delivered the document to Chapin

---

[2] The parties dispute whether Ian's lawyers were there during the signing. (*See, e.g.*, ECF No. 14, pp. 2, 9).

Davis at 10:00 AM, an hour before Cynthia's death. (ECF No. 14, p. 3). Chapin Davis, the financial firm holding the assets, then transferred the assets to Ian. *Id.*

During her time at Gilchrist, it is uncontroverted Cynthia was in extreme physical discomfort. Gilchrist's records show Cynthia was in "a lot of pain" all over her body and was "totally dependent for all care." (ECF No. 14, Ex. 4, pp. 1, 5). Cynthia's caregivers administered morphine to her for "severe pain." *Id.* at Ex. 1, p. 1.

The parties dispute her mental state. Ian maintains Cynthia was fully competent to sign the transfer document and submits an affidavit from the notary who witnessed the signing. The affidavit provides, in relevant part, Cynthia understood the "nature of her acts and the contents of the Document" and "desired to sign the Document." (ECF No. 23, Ex. C, p. 2). Todorov, on the other hand, cites Gilchrist's records, which show Cynthia's mental state vacillated. On April 10, for example, before Cynthia signed the transfer document, a nurse reported Cynthia was "alert, verbally responsive, [and] using humor in her speaking." (ECF No. 14, Ex. 7, p. 1). After Cynthia signed the document, however, the same nurse reported Cynthia was "sobbing, anxious, disrobing, [and] attempting to get [out of bed]." *Id.* The nurse's observations conform to a chaplain's report from the same night, which described Cynthia as "frightened," "worried," "somewhat angry," and "confused about what is happening to her." *Id.* at Ex. 6, p. 1.

After Todorov filed a complaint against Ian, and before discovery began in earnest, Todorov filed a motion for summary judgment, which the parties then fully briefed. (ECF No. 14). Shortly thereafter, Ian filed a motion to dismiss and Todorov filed a response. (ECF Nos. 15, 16). Ian failed to reply. Three months later, following the close of discovery (ECF No. 22), Ian filed a motion for summary judgment and Todorov filed a response. (ECF Nos. 23, 24). Again, Ian did not file a reply.

**STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247 (1986). A fact is material only when it affects the outcome of the litigation. *Id.* at 248. A genuine dispute regarding material facts exist where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing a motion for summary judgment, the court must look at facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Trial courts have an affirmative obligation to prevent "factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323–24). In response to a properly supported motion for summary judgment, the non-moving party must establish a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49. To wit, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). A court should also enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## ANALYSIS

**I. Undue Influence**

Both Todorov and Ian move for summary judgment on Todorov's claim that Ian exerted undue influence over Cynthia. Both summary judgment motions are denied on the ground that there is a genuine dispute of material fact as to whether Ian's conduct constituted undue influence.

To start an inquiry into an undue influence claim, a court must determine whether the transfer was *inter vivos* or testamentary. *Leimbach v. Allen*, 976 F.2d 912, 917 (4th Cir. 1992). Here, it is uncontested the transfer from Cynthia to Ian was *inter vivos*.[3] (*Cf.* ECF No. 15, pp. 11–12). To determine which party carries the burden of proof in a case involving an *inter vivos* transfer, the factfinder must identify whether a confidential relationship existed between the transferor and transferee. *Upman v. Clarke*, 753 A.2d 4, 5 (Md. 2000). If the factfinder identifies a confidential relationship, a presumption of undue influence is created, and the burden shifts "to the donee to establish, by clear and convincing evidence" there was no undue influence and the transfer was "fair and reasonable."[4] *Id.* at 5, 9; *see also Walton v. Davy*, 586 A.2d 760, 767 (Md. App. 1991); *Conrad v. Gamble*, 962 A.2d 1007, 1014–15 (Md. 2008). If no confidential relationship is found to exist, the burden of proof remains with the plaintiff throughout proceedings. *Treffinger v. Sterling*, 305 A.2d 829, 832 (Md. 1973).

---

[3] Cynthia signed the transfer document gifting assets to her brother on April 10, 2014, one day before her death. Chapin Davis made the transfer of the assets on the morning before Cynthia's death on April 11. Accordingly, the transfer was *inter vivos*.

[4] To determine whether a transaction was fair and reasonable, courts look to "the voluntariness of the act; (2) the stripping of the donor of his or her assets vis-à-vis the incidence of control retained by the donor; (3) the motive of the person in whom the confidence was reposed; (4) the degree to which the donor heeded the advice of the person possessed of the donor's confidence; (5) whether the donor acted upon independent advice; and (6) the comprehension of the donor of what he or she was doing." *Midler v. Shapiro*, 364 A.2d 99, 106 (Md. App. 1976) (citations omitted).

The standard for undue influence under Maryland law is well settled. *Leimbach*, 976 F.2d at 917 (4th Cir. 1992). The central inquiry in determining the question of undue influence is whether the defendant exerted coercion sufficient to force the transferor to follow the defendant's judgment. *Moore v. Smith*, 582 A.2d 1237, 1239 (Md. 1990). A plaintiff must show the coercion rose to a level where the transferor's free will was destroyed. *Id.* (quoting *Nalley v. Nalley*, A.2d 849, 852 (Md. 1969)). To sustain a claim for undue influence, a court must, at a minimum, find: (1) a confidential relationship existed between the transferor and transferee; and (2) the transferor was highly susceptible to undue influence. *See Green v. McClintock*, 97 A.3d 198, 217 *cert. denied*, 103 A.3d 594 (Md. App. 2014) (holding these two factors essential to an undue influence claim).[5] Whether conduct constitutes undue influence is a factual matter. *Leimbach*, 976 F.2d at 917.

    **a.  Confidential Relationship**

In addition to determining the parties' respective burdens of proof, the question of whether a confidential relationship exists also determines the viability of Todorov's entire undue influence claim. Specifically, to sustain a claim for undue influence, a factfinder must find a confidential relationship existed between the transferor and transferee. *See Green*, 97 A.3d at 217 (holding that a relationship of confidence and trust was a "necessary condition[] for a finding of undue influence"); *Orwick v. Moldawer,* 822 A.2d 506, 509 (2003) (finding the same).

---

[5] Besides the existence of a confidential relationship and the susceptibility of the transferor to undue influence, Maryland courts also examine other factors to determine whether a defendant exerted undue influence. The other factors include whether: "2. The will contains substantial benefit to the beneficiary; 3. The beneficiary caused or assisted in effectuating execution of [the] will; 4. There was an opportunity to exert influence; 5. The will contains an unnatural disposition; 6. The bequests constitute a change from a former will . . . ." *Moore*, 582 A.2d at 1239. Although *Moore* involved a testamentary gift, the *Moore* factors apply to *inter vivos* transfers as well. *See, e.g.*, *Conrad*, 962 A.2d at 1019–23 (applying the *Moore* factors to an *inter vivos* transfer).

Because a genuine issue of fact exists as to this material issue, summary judgment is properly denied on this ground alone.

A confidential relationship exists when the grantor "must necessarily repose trust and confidence in the good faith and integrity of the other." *Id.* at 511 (quoting *Green v. Michael*, 36 A.2d 923, 926 (Md. 1944)); *see also Tracey v. Tracey*, 153 A. 80, 85 (Md. 1931) (holding that a confidential relationship is presumed when "one must from the very necessities of the situation repose confidence in the other, and where the one in whom such confidence is reposed is thereby enabled to exert a dominating and controlling influence over the other").

The controlling factor in determining the existence of such a confidential relationship is whether the transferor evinced dependence on the transferee. *See Upman*, 753 A.2d at 9; *Orwick v. Moldawer*, 822 A.2d 506, 511 (Md. App. 2003) (stating that to establish a confidential relationship "there must appear at least a condition from which dependence of the grantor may be found") (internal citations omitted). To establish dependence, courts look to whether the transferor endowed trust and confidence in the transferee. The level of trust and confidence must reach a point whereby "the [transferor] trusts another to conduct the [transferor's] business . . . ." *Id.* at 512; *see also Desser v. Woods*, 296 A.2d 586, 593 (Md. 1972) (finding a prima facie confidential relationship when a transferor relied on a transferee for advice and handling of personal and business affairs); *Moore*, 582 A.2d 1237, 1241–42 (finding a confidential relationship when a transferor was dependent on the transferee for his physical needs and to manage his personal and financial affairs). Moreover, the proponent of the confidential relationship must show "that by virtue of the relationship between [the transferor and transferee], [the transferor was] justified in assuming the other party [would] not act in a manner inconsistent with [her] welfare." *Bell v. Bell*, 379 A.2d 419, 421 (Md. App. 1977).

There is a genuine issue of material fact regarding whether a confidential relationship existed between Cynthia and Ian.  It is undisputed Cynthia appointed Ian as her primary care giver and health care decision maker.  While at Gilchrist, Ian was protective of Cynthia, indicating, on two occasions, that he did not want his sister disturbed and correcting Cynthia when she misremembered a medical procedure.  (ECF No. 14, Ex. 5, p. 1, Ex. 6, p. 1).  Ian also participated in Cynthia's care when the Gilchrist staff educated him on Cynthia's plan of care and medications.  *Id.* at Ex. 4, pp. 1, 8–9.  On the other hand, it is uncontroverted Ian did not play a role in his sister's care before April 2014 and he made no health care decisions for his sister once she arrived at Gilchrist.  (ECF No. 23, Ex. A, 23:14–19, 72:9–73:11).  The record also indicates Cynthia made the decision to enter Gilchrist without Ian's input.  *See id.* at Ex. A, 73:3–8.  Todorov himself admits the appointment of Ian as Cynthia's health care decision maker and primary care giver was "just procedure."  *Id.* at 73:9–11.  Accordingly, a genuine issue of material fact exists as to the importance of Ian's role in Cynthia's life during Cynthia's last days.

In addition to appointing Ian as her primary care giver and health care decision maker, there is other evidence Cynthia trusted and depended on Ian.  Ian, by his own testimony, helped manage Cynthia's financial affairs by volunteering to draft and deliver the Chapin Davis transfer document.  (ECF No. 23, at Ex. B, 27:18–28:6, 39:21–41:6).  Cynthia also named Ian as a beneficiary for her separate IRA account.  *Id.* at Ex. A, 33:14–34:7.  Besides these transactions, however, Todorov claims Cynthia did not involve Ian in her financial affairs.  *Id.* at Ex. A, 56:5–14, 56:7–13.  Further, according to Todorov's testimony, Ian and Cynthia did not have a close personal relationship.  Todorov claims Ian visited Todorov and Cynthia's home sparingly and that the two siblings did not get along.  *Id.* at Ex. A, 34:20–36:21.  Because there is plausible conflicting evidence regarding the siblings's relationship, it is the factfinder's job to determine

whether the nature of Ian and Cynthia's relationship was that of dependence or merely sibling affection.

The parties' presentation of adverse evidence on the issue of whether a confidential relationship existed raises a genuine issue of material fact.[6] On this independently sufficient ground, the parties' motions for summary judgment on the issue of undue influence are properly denied. Although this ends the court's summary judgment inquiry, I also note below a genuine issue of material fact as to another essential undue influence factor–whether Cynthia was highly susceptible to undue influence.

### b.  High Susceptibility to Undue Influence

For a viable claim of undue influence, Maryland courts hold that, in addition to finding a confidential relationship, there must also be a finding that the transferor was highly susceptible to undue influence. *See Green*, 97 A.3d at 217 (noting that a transferor's high susceptibility to undue influence is a "necessary condition[] for a finding of undue influence"); *Anderson v. Meadowcroft,* 661 A.2d 726, 731 (Md. 1995) (dismissing an complaint because it did not allege facts sufficient to show a transferor had a high susceptibility to undue influence). Maryland law recognizes a transferor has a high susceptibility to undue influence when the transferor's "mental state has deteriorated or where one is highly dependent on the beneficiary to meet vital physical needs." *Sample v. Fleming*, No. 96-1547, 1997 WL 568677, at *4 (4th Cir. Sept. 15, 1997) (per

---

[6] In his motion for summary judgment, Todorov argues Ian and Ian's lawyers' invocation of Fifth Amendment and attorney-client privilege, respectively, precludes Ian from offering evidence or testimony on two subjects: (1) whether a lawyer represented Ian at the signing of the transfer document; and (2) Ian's dealings with Cynthia's assets. (*See* ECF No. 14, pp. 3–9). Todorov obscures the fundamental issue at summary judgment, which is whether the evidence in the record raises a genuine issue of material fact. Given Ian's case substantially relies on hospital records and Todorov's own testimony, even if this court excluded Ian and his lawyers' testimony on these questions, a genuine issue of material fact would still exist. Accordingly, Todorov's privilege arguments are properly the subject of pre-trial evidentiary motions.

curiam); *see also Anderson*, 661 A.2d at 731 (identifying cases where a high susceptibility to undue influence was found because (1) a transferor's mental state deteriorated or (2) a transferor was highly dependent on the defendant's care). In the present case, because Gilchrist was tending to Cynthia's palliative care, Cynthia was not dependent on Ian for her vital physical needs.

The question thus becomes whether Cynthia's mental state deteriorated by the time of the transfer. In determining a transferor's mental state, courts consider the transferor's physical state, dependence on defendant, medications, and level of isolation. *See, e.g.*, *Green*, A.3d at 218 (Md. App. 2014) (considering all of the above in declaring that a decedent was highly susceptible to undue influence). A court considers these factors taken together–no one factor controls. *Cf. Orwick*, 822 A.2d at 513 n.4 (requiring more than one of the factors for a finding of high susceptibility to undue influence). For example, a court may not presume a transferor to be highly susceptible to undue influence simply because she is very ill. *Zook v. Pesce*, 91 A.3d 1114, 1126–27 (Md. App. 2014) ("Illness alone is not sufficient to support [the susceptibility] factor.").

There is a genuine dispute of material fact over whether Cynthia was highly susceptible to Ian's influence. Gilchrist's records show Cynthia was in significant physical pain during her stay at Gilchrist. For example, one nurse's account described Cynthia as "in severe pain" all over her body. (ECF No. 14, Ex. 1, p. 1). Another nurse echoed her colleague and said Cynthia was in "a lot of pain." *Id.* at Ex. 4, p. 1. The records also reveal that, at times, Cynthia was under mental distress. A chaplain described Cynthia as "frightened," "worried," "somewhat angry," and "confused." *Id.* at Ex. 6, p. 1. Another nurse reported that, on the night before she died, Cynthia was "sobbing, anxious, disrobing, [and] attempting to get [out of bed]." *Id.* at Ex.

7, p. 1. Cynthia was also heavily medicated–Cynthia's doctors had prescribed Cynthia a variety of drugs to treat "agitation" and "severe pain." *Id.* at Ex. 1, p. 1.

By the same token, there is also evidence showing Cynthia was not highly susceptible to undue influence. On the same day Cynthia signed the transfer document, a nurse reported Cynthia was, "alert, responsive, [and] using humor in her speaking." *Id.* at Ex. 7, p. 1. Further, Todorov testifies Cynthia was not isolated while at Gilchrist–Todorov and other family and friends were by her side for the duration of her stay. (ECF No. 23, Ex. A, 38:5–12). Most importantly, the record contains an affidavit from the notary public who witnessed the signing of the transfer document in which the notary public testifies Cynthia understood the "nature of her acts and the contents of the Document" and "desired to sign the Document." *Id.* at Ex. C, p. 1. Accordingly, on the critical issue of whether Cynthia was highly susceptible to undue influence, it is for a factfinder to decide which party's evidence to believe.

Given a genuine dispute of fact exists for the critical questions of whether Cynthia and Ian stood in a confidential relationship and whether Cynthia was highly susceptible to undue influence, summary judgment is inappropriate for the claim of undue influence.[7]

## II.    Unjust Enrichment

Both Todorov and Ian move for summary judgment on Todorov's claim that Ian unjustly enriched himself by exerting undue influence over Cynthia. Todorov styles his unjust enrichment claim as an alternative to his undue influence claim. (ECF No. 1, ¶ 30). In his claim

---

[7] A genuine dispute of fact as to other factors for undue influence also exists. For example, parties dispute whether the transfer to Ian was an unnatural disposition. (*Compare* ECF No. 23, pp. 21–23 *with* ECF No. 24, pp. 8–10). Given his position as Cynthia's closest relative and Cynthia's designation of Ian as her IRA beneficiary, Ian argues the transfer at issue was not unnatural. On the other hand, Todorov argues the two siblings were not close and the transfer constituted an unnatural departure from the existing state of affairs–intestate succession. A reasonable factfinder could find either way.

for unjust enrichment, Todorov does not incorporate any new factual allegations.  Because the Todorov raises the same issues in his undue influence and unjust enrichment claims, a genuine issue of material fact also exists as to Todorov's unjust enrichment claim.  Summary judgment is thus, properly denied.

## **CONCLUSION**

For the foregoing reasons, plaintiff and defendant's motions for summary judgment and defendant's motion to dismiss are denied.  A separate order follows.


__September 11, 2015__                                           _____/s/_____
Date                                                                J. Frederick Motz
                                                                    United States District Judge